# In the United States Court of Federal Claims

Nos. 23-47C; 23-175C
(Filed: May 17, 2023)
(Re-filed: May 24, 2023)[1]

* * * * * * * * * * * * * * * * * * * * * * * * * *

STG INTERNATIONAL, INC.,

*Plaintiff*,

v.

THE UNITED STATES

*Defendant.*

* * * * * * * * * * * * * * * * * * * * * * * * * *

NORTH EAST SOUTH WEST HEALTHCARE SOLUTIONS, LLC,

*Plaintiff*,

v.

THE UNITED STATES,

*Defendant*.

* * * * * * * * * * * * * * * * * * * * * * * * * *

Bid protest; pre-award bid protest; phased procurement; legal offer; FAR 52.204-7; SAM registration; price analysis; past performance; discussions; injunction.

*Craig A. Holman,* Washington, DC, for plaintiff, STG International, with whom was *Thomas A. Pettit*, of counsel.

*Aron C. Beezley*, Washington, DC, for consolidated plaintiff, North East South West Healthcare Solutions, with whom were *Gabrielle A. Sprio* and *Ariella Cassell*, of counsel.

[1] This opinion was originally issued under seal. We have redacted information to protect proprietary information and the competitive process.

*Vincent D. Phillips*, Senior Trial Counsel, United States Department of Justice, Commercial Litigation Branch, with whom were *Brian M. Boynton*, Principal Deputy Assistant Attorney General, *Patricia M. McCarthy*, Director, and *Reginald T. Blades, Jr.*, Assistant Director, for defendant. *Augustus Golden*, United States Department of Justice, and *Diane Foose*, United States Immigration and Customs Enforcement, of counsel.

## OPINION

This is a consolidated pre-award bid protest of the United States Immigration and Customs Enforcement's (ICE) decision to exclude two contractors from a competitive range. The matter is fully briefed, and oral argument was held on May 9, 2023. For the reasons below, we sustain only NESW's protest.

## BACKGROUND

### I. Solicitation and Evaluation Scheme

The United States provides healthcare services to illegal immigrants held in ICE facilities. As part of that effort, ICE issued the current solicitation to provide medical staffing in various ICE facilities, under which it anticipated awarding five to seven indefinite delivery, indefinite quantity contracts on a best-value basis.

The proposal submission and agency evaluation process proceeded in two phases. In Phase I, contractors submitted the first half of their proposal, which addressed the solicitation's three most important factors: (1) corporate experience, (2) scenario, and (3) capability. For the first two factors, the agency conducted oral presentations where bidders first discussed a previously completed "Corporate Experience Questionnaire." AR 5371. Then, after discussing corporate experience, the agency described a hypothetical scenario in which the bidder experiences critically low staffing at difficult to fill locations and asked the bidder to provide a corrective action plan. For the third Phase I factor, however—which was capability—bidders instead submitted a writing that demonstrated their ability to meet the solicitation's requirements.

At the end of Phase I, the agency issued Advisory Notice Letters. These letters, which were unique to each bidder, contained the agency's

evaluation of the bidder's Phase I proposal and the agency's recommendation as to whether the bidder should proceed to Phase II. While a recommendation not to proceed did not eliminate a bidder from the competition, it did mean that the bidder was "unlikely to be a viable competitor[]." AR 5381–82.

Phase II required contractors to submit the second half of their proposal, which addressed three additional factors (listed in descending order of importance): (1) plans, (2) past performance, and (3) price. First, the plans factor involved the submission of several plans for contract management, extended absence and backfill coverage, quality control, transition-in, and corporate organization. Next, for past performance, offerors provided information about three "recent and relevant contracts in which they served as the prime contractor or subcontractor for . . . at least one . . . year in duration." AR 5375. And finally, each offeror provided the agency with its pricing schedule, which the agency would evaluate for reasonableness and completeness.

## II. Agency Evaluation

Shortly after Phase I proposals were submitted on October 29, 2021, the agency issued its advisory notice letters. Because NESW had one of the highest rated Phase I proposals, the agency encouraged it to proceed to the next phase. STGi's proposal, on the other hand, was not highly rated and therefore was not recommended to continue to Phase II. Still, both bidders submitted Phase II proposals. After Phase II, the agency established a competitive range of the highest rated offers. The agency's competitive range included NESW (who eventually received a contract award) but not STGi.

STGi protested its exclusion from the competitive range—first unsuccessfully at the Government Accountability Office and then at this court. Before we resolved STGi's protest, however, the agency announced that it would take corrective action and rescinded the previously awarded contracts. The agency explained that it may "allow proposal revisions," "conduct additional evaluation of the proposals received in Phase II," or "use any other measures" allowed under the Federal Acquisition Regulations (FAR). Def.'s Notice of Corrective Action at 1, *STG Int'l, Inc. v. United States*, No. 22-1340 (Fed. Cl. Oct. 3, 2022).

The agency's corrective action included a re-evaluation of each proposal, which led to the following result:

AR 20165. Based on these results, the agency established a new competitive range, which this time excluded both STGi and NESW. Although NESW received a contract award under the first competitive range, it was now deemed ineligible for an award because it was not registered in the System for Award Management (SAM) when it submitted its Phase I proposal.[2] STGi and NESW each protested their exclusion in this court, which we consolidated into one protest.

[2] NESW was registered in SAM on November 10, 2021, which was before it submitted its Phase II proposal.

DISCUSSION

We review bid protests in accordance with the standards laid out in the Administrative Procedure Act (APA). *Advanced Data Concepts, Inc. v. United States*, 216 F.3d 1054, 1057 (Fed. Cir. 2000) (citing 28 U.S.C. § 1491(b)(1)). Under the APA, an agency's actions cannot be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

## I. NESW's Protest

### A. Legal Offer

The FAR requires all offerors "to be registered in SAM when submitting an offer or quotation." FAR 52.204-7(b)(1). Based on this provision, the agency decided that all bidders needed to be registered in SAM by the end of Phase I, which NESW was not.[3] NESW responds that its proposal was not an offer until its Phase II submission, and, for that reason, did not need to be registered in SAM until that time.[4]

This protest requires us to decide when a proposal becomes an offer. To answer that question, we look to the FAR because when a statute or regulation "includes an explicit definition, we must follow that definition even if it varies from a term's ordinary meaning." *Dig. Realty Tr. v. Somers*, 138 S. Ct. 767, 776 (2018). With that in mind, the FAR explains that an "offer" is "a response to a solicitation that, if accepted, would bind the offeror to perform the resultant contract." FAR 2.101. That means, in other words, that a proposal is not an offer unless the government's acceptance of it would create a binding contract.[5]

---

[3] NESW does not dispute that it was not registered in SAM when it submitted its Phase I proposal.

[4] NESW has standing to challenge its exclusion from the agency's competitive range because it was an actual bidder and has alleged a "non-trivial competitive injury." *Sys. Application & Techs., Inc. v. United States*, 691 F.3d 1374, 1382 (Fed. Cir. 2012).

[5] The government only confuses the issue by reading the FAR's definition of an "offer" to include any response to a request for proposals. The second sentence of the FAR's definition does not provide an alternative definition

The creation of a binding government contract is largely controlled by common-law legal principles. *United States v. Winstar Corp.*, 518 U.S. 839, 895 (1996). Under those principles, an offer can form the basis of an enforceable contract only if it is "sufficiently definite so that the major terms and conditions are reasonably capable of ascertainment." *Penn-Ohio Steel Corp. v. United States*, 173 Ct. Cl. 1064, 1084 (1965). While that does not mean that an offer must have certainty as to all terms, it does require a "meeting of the minds on [all] essential terms," which typically includes price. *Keehn v. United States*, 110 Fed. Cl. 306, 327 (2013).

Here, the Phase I proposals were not offers because they did not include all the essential terms necessary to establish a binding contract. Indeed, as the government conceded at oral argument, the Phase I proposals could neither be accepted by the government nor produce a valid contract.[6] That is because the Phase I proposals only addressed corporate experience, scenario, and capability—but not price, which was supplied during Phase II. Thus, because the agency's hypothetical acceptance of NESW's Phase I proposal would not establish a binding contract, its Phase I submission did not satisfy the FAR's definition of an "offer."

To be sure, there are cases where price is not an essential term, as when the contractual consideration involves an exchange of services or goods and not money, but this is not one of those cases. In fact, under this solicitation, price was a critical aspect of each contractor's proposal as the agency anticipated using firm-fixed-price contracts. A firm-fixed-price contract is a contract that "provides for a price that is not subject to any

but simply explains that—under the definition already provided—a proposal is a type of solicitation response that *can* be an offer when its acceptance would create an enforceable contract.

[6] The government's briefing also acknowledged the insufficiency of the Phase I proposals. *See* Def.'s Reply at 4 ("[NESW's] 'offer' in this case consists of its entire proposal . . . ."); *id.* at 5 ("In no situation could the government accept a proposal or bind the offeror to perform on the basis of only Volume V."); *id.* at 7 ("This shows that all of the proposal volumes are necessary for the agency to award a contract and bind an offeror."); *id.* at 8 ("NESW is correct that the agency could not have awarded a contract on the basis of Phase I proposals only . . . .").

adjustment on the basis of the contractor's cost experience in performing the contract." FAR 16.202-1. In other words, the contractor's price acts as a cap and shifts "maximum risk and full responsibility for all costs and resulting profit or loss." *Id.* In this context, then, the offer must include a price. *Keehn*, 110 Fed. Cl. at 327.

The agency's solicitation is also consistent with this understanding of an offer. As NESW points out, the solicitation explained that a contractor's submission of its price resulted in the submission of a legal offer:

> [Volume V (Price)] also shall include the following:
>
> 1) Legal Offer: Identification and Cover Letter
>
>> Legal Offer (Identification and Cover Letter): The proposal shall include a cover letter that identifies all enclosures being transmitted as part of the proposal. The letter shall reference the solicitation number and acknowledge that it transmits an offer in response to the solicitation. It shall state proposal validity through at least 12 months after the proposal submission deadline.
>
> 2) All signed SF 33
>
>> Blocks 13, 14, 15, 16, and 18 of page 1 of SF 33 shall be completed by contractors and Block 17 shall be digitally signed to show that the contractor has read and agrees to comply with all the conditions and instructions provided in the solicitation document.

AR 5481.

NESW was thus unlawfully excluded from the agency's competitive range. Its proposal was not an offer until its Phase II submission, at which point it was properly registered in SAM.[7]

---

[7] Because we agree that the agency unlawfully excluded NESW under FAR 52.204-7, we need not consider NESW's other arguments related to SAM registration. As for NESW's arguments about the agency's evaluation of its

**B. Injunctive Relief**

NESW seeks a permanent injunction. When a party seeks injunctive relief, the "court must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Winter v. Nat'l Res. Def. Council*, 555 U.S. 7, 24 (2008). In doing so, courts consider four factors: (1) whether the plaintiff succeeds on the merits; (2) whether the plaintiff will suffer irreparable harm without injunctive relief; (3) whether the "balance of hardships" favors the plaintiff; and (4) whether the injunction is in the public's interest. *PGBA, LLC v. United States*, 389 F.3d 1219, 1228–29 (Fed. Cir. 2004). First, we have already established NESW's success on the merits.

Second, NESW will suffer irreparable harm without intervention. A "protestor suffers irreparable harm if it is deprived of the opportunity to compete fairly for a contract." *FCN, Inc. v. United States*, 115 Fed. Cl. 335, 384 (2014). The same is also true when a protestor will lose the profits it could have obtained through the contract. *Fed. Acquisition Servs. Team, LLC v. United States*, 124 Fed. Cl. 690, 708 (2016). Here, NESW's unlawful exclusion means that it will lose both potential profits and the opportunity to compete.

Next, we must "consider whether the balance of hardships leans in the plaintiff's favor." *Id.* That task is not difficult, however, as the government has not identified any harm that it will suffer from this injunction. Thus, the balance of hardships favors NESW.

Finally, the court must assess the public interest. In the government contract context, the public has an "overriding . . . interest in preserving the integrity of the federal procurement process by requiring government officials to follow procurement statutes and regulations." *AshBritt, Inc. v. United States*, 87 Fed. Cl. 344, 379 (2009). Because the government unlawfully excluded NESW, an injunction is in the public interest. Thus, the agency is enjoined from awarding any contracts until it reconsiders whether NESW should be included in the competitive range.

---

proposal, we believe that it would be unnecessary to address those issues in the context of the current protest.

## II. STGi's Protest

We now turn to our other consolidated protest, in which STGi mounts a comprehensive attack against the agency's exclusion of its proposal from the competitive range. First, STGi argues that the agency unlawfully analyzed price. Second, it argues that the agency conducted a flawed past performance evaluation. And third, it believes that the agency unequally engaged in discussions. In all these arguments, STGi faces an uphill battle as it received low scores in the most important factors—corporate experience, scenario, and capability—and, on that basis, was advised at the end of Phase I that it was unlikely to receive an award. We address each argument in turn.

### A. Price Analysis

STGi challenges the agency's price analysis. First, it argues that the agency failed to consider STGi's "massive price savings" meaningfully. Pl.'s MJAR at 18. Instead, it claims that the agency simply ranked STGi's price without explaining why the benefits presented by other proposals outweighed STGi's price savings.

When a protestor challenges a negotiated procurement, it carries a high burden because "the contracting officer engages in what is inherently a judgmental process." *Galen Med. Assocs. v. United States*, 369 F.3d 1324, 1330 (Fed. Cir. 2004). That burden is even higher when, as here, the contract will be awarded on a "best value" basis in which the contracting officer has "substantial discretion to determine which proposal represents the best value for the government." *E.W. Bliss Co. v. United States*, 77 F.3d 445, 449 (Fed. Cir. 1996). Because of that substantial discretion, we will not interfere with an agency's decision over "[m]ere disagreement." *Blackwater Lodge & Training Ctr. v. United States*, 86 Fed. Cl. 488, 514 (2009). Rather, the agency's decision must instead be arbitrary, which will not be the case when the "agency documents its . . . decision and includes the rationale for any business judgments and tradeoffs made." *Price Gordon Servs. v. United States*, 139 Fed. Cl 27, 60 (2018).

The record demonstrates that the agency reasonably considered the price savings offered by STGi. Indeed, when the agency evaluated STGi's proposal, it expressly acknowledged that STGi's proposal presented "possible price savings." AR 20171. Even so, the agency reiterated that price

was the least important evaluation factor and went on to describe STGi's weaknesses. Considered altogether, the agency concluded that "STGi's pricing [did] not overcome the weaknesses and significant weaknesses associated with their technical approach." *Id.* Because the agency documented the tradeoffs and reasonably determined that technical superiority presented better value than price, we will not second guess that decision. *Price Gordon*, 139 Fed. Cl. at 60.

Second, STGi complains that the agency's method for evaluating price reasonableness was arbitrary because it failed to use any metrics or thresholds for determining reasonableness. We disagree. The FAR gives agencies considerable discretion when choosing a method for evaluating price reasonableness. FAR 15.404-1(b)(2); *see also* 15.404-1(b)(2)(i)–(vii). One acceptable method available to the government is a "[c]omparison of proposed prices received in response to the solicitation" where "adequate price competition establishes a fair and reasonable price." 15.404-1(b)(2)(i). In fact, the FAR prefers this method, 15.404-1(b)(3), and so there is no merit to STGi's charge that the agency's method was arbitrary.

Nor do we agree that the agency's execution of that evaluation method was unreasonable. The agency determined that adequate price competition existed—a conclusion that STGi does not appear to dispute—and compared the prices received. A percentage difference matrix does not make the agency's comparison unreasonable. "[T]he rule is that, to be found fair and reasonable in comparison with other proposed prices, the price being assessed either must be consistent with those other prices or favorably compare with those other prices." *Newimar S.A. v. United States*, 160 Fed. Cl. 97, 135 (2022) (emphasis omitted). We fail to see how a percentage difference matrix is an irrational tool for comparing prices.

STGi's reliance on *Fluor Intercontinental v. United States* is misplaced. 147 Fed. Cl. 309 (2020). There, even though the agency had received a "wide range in proposed prices," it concluded that each awardee's price was reasonable by only determining that the lowest priced offer was fair and reasonable, which it then compared to the next lowest price. *Id.* at 335–36. That approach failed to consider the wide disparity between the prices. *Id.* at 336. The contracting officer then compounded that error when her independent analysis simply compared the percentage difference between each offeror and the two lowest prices. *Id.* Thus, the court concluded

that the agency's "bare comparison of percentage differentials in price, without further analysis, [was] inadequate for purposes of conducting a meaningful price reasonableness evaluation." *Id.*

STGi's protest is dissimilar from *Fluor*. Here, the agency acknowledged the disparity in prices and attributed those differences to the [redacted] AR 20156. We accept that explanation as reasonable and uphold the agency's decision. *See Technatomy Corp. v. United States*, 144 Fed. Cl. 388, 390 (2019) (holding that the agency conducted a meaningful price analysis, in part, because it provided a sufficient explanation for price variation).

**B. Past Performance**

Next, STGi challenges the agency's past performance evaluation. First, it contends that the agency should have disregarded a defective past performance questionnaire, relied solely on the corresponding CPARS report, and then reevaluated STGi's past performance.

Challenging an agency's past performance evaluation is a difficult task. *Overstreet Elec. Co. v. United States*, 59 Fed. Cl. 99, 117 (2003). Indeed, when the decision "at issue is a performance evaluation, the greatest deference possible is given to the agency—what our Court has called a 'triple whammy of deference.'" *Commissioning Sols. Global v. United States*, 97 Fed. Cl. 1, 9 (2011). In that vein, agencies possess substantial discretion to decide what past performance data is relevant and "may give unequal weight or no weight at all to different contracts when the contracting officer views one as more relevant than another." *Seaborn Health Care, Inc. v. United States*, 101 Fed. Cl. 42, 51 (2011) (cleaned up). A protestor, then, must show that the agency had no rational basis for the assigned performance rating. *Overstreet Elec.*, 59 Fed. Cl. at 117.

The record demonstrates that the agency had a rational basis for its performance evaluation. The agency acknowledged that one of STGi's questionnaires contained a "minor inconsistency" but clarified that the inconsistency had "no impact on the evaluation, the [evaluation team's] confidence, or the overall rating of the factor." AR 20144 n.1. Instead, the

agency explained that "the CPARS and [past performance questionnaire] show[ed] performance [had] been inconsistent and vacillate[d] between satisfactory (or above) performance and marginal performance, and often performance AQLs were clearly not met." AR 20145. Whether or not we agree with the agency's conclusion, its explanation is rational. *See Torres Adv. Enter. Sols. v. United States*, 133 Fed. Cl. 496, 531 (2017) ("[T]he court's review is limited to ensuring that the evaluation was reasonable.").

Second, STGi argues that the agency was required to give it an opportunity to respond to any adverse past performance information. Under FAR 15.306, agencies must provide offerors an opportunity to address adverse past performance information if that "information is the determining factor preventing them from being placed within the competitive range." 15.306(b)(1)(i). We agree with the government that STGi's past performance information was not the determining factor that excluded it from the competitive range. The most important evaluation factors were corporate experience, scenario, and capability—all of which were evaluated during Phase I. Based on STGi's scores for those factors, the agency recommended that STGi not proceed to Phase II because it was unlikely to receive a contract award. As a result, we are unconvinced that STGi's past performance rating was the reason for its exclusion.

**C. Discussions**

Finally, STGi argues that the agency unequally engaged in discussions. In its view, the agency asked questions during some offerors' Phase I oral presentations that gave those offerors a chance to address weaknesses and omissions in their proposals. As a result, STGi believes that those conversations amounted to discussions. The government responds, however, that these conversations were nothing more than clarifications.

Discussions are an exchange between the government and an offeror that typically "allow[] the offer to revise its proposal." 15.306(d). While the "scope and extent of discussions are a matter of contracting officer judgment," their ultimate purpose it to "maximize the government's ability to obtain the [best] value." 15.306(d)(2)–(3). When an agency uses discussions, it must engage in them "with each offeror in the competitive range." 15.306(d)(1). To not do so would give an "unfair advantage" to any offeror who had the opportunity to participate in discussions. *Info. Tech. &*

*Applications Corp. v. United States*, 316 F.3d 1312, 1320 (Fed. Cir. 2003) (*ITAC*).

Clarifications, on the other hand, are "limited exchanges" that only allow offerors to "clarify certain aspects of proposals." 15.306(a)(1)–(2). Those aspects include "the relevance of an offeror's past performance information and adverse past performance information to which the offeror has not previously had an opportunity to respond." 15.306(a)(2). They can also be used to correct "minor or clerical errors." *Id.* Most important, though, at least for our purposes, is that, "unlike discussions, the government is permitted to engage in clarifications with fewer than all offers." *ENGlobal Gov't Servs. v. United States*, 159 Fed. Cl. 744, 765 (2022).

The line that distinguishes between discussions and clarifications—or the "acid test," as this court has also called it—is whether "an agency afforded an offeror the opportunity to revise or modify its proposal." *Id.* A proposal revision, however, is not simply an exchange of relevant or even "essential" information, as any "meaningful clarification would require the provision of information." *ITAC*, 316 F.3d at 1323. Instead, the change to the proposal must be substantive. *See Galen Med. Assocs. v. United States*, 369 F.3d 1324, 1332 (Fed. Cir. 2004). And in close cases, we must defer to "an agency's reasonable interpretation" of the challenged exchange. *ENGlobal*, 159 Fed. Cl. at 766.

Here, the agency's communications did not allow offerors to substantively revise their proposals. For example, STGi points to the following exchange between the agency and [REDACTED]:

**Ian Somppi**:

Can you – I may have missed it – but can you guys clarify your experience with collaborative practice agreements?



. . .

**Ian Somppi**:

Great, thank you.

AR 9738–39 (transcript edited for readability). Nothing in this dialogue—or any other—allowed the bidder to revise its proposal. Thus, the agency did not conduct discussions during the Phase I oral presentations.

We have considered STGi's remaining arguments, and we are unpersuaded by them. Because STGi has not succeeded on the merits of its claim, we need not discuss whether it is entitled to injunctive relief.

CONCLUSION

In sum, NESW has shown that it was properly registered in SAM when it submitted its Phase II proposal and was therefore unlawfully excluded from the agency's competitive range. Because that ground is sufficient to sustain its protest, we do not address its remaining arguments. Conversely, STGi has not demonstrated that the agency's evaluation of its proposal was arbitrary, capricious, or otherwise not in accordance with law. We order the following:

1. NESW's motion for judgment on the administrative record is granted (Case No. 23-175).

2. STGi's motion for judgment on the administrative record is denied (Case No. 23-47).

3. The government's motion for judgment on the administrative record as to NESW is denied.

4. The government's motion for judgment on the administrative record as to STGi is granted.

5. The agency is enjoined from awarding any contracts until it considers whether NESW should be included in the competitive range.

6. The Clerk of Court shall enter judgment in each case accordingly.

s/Eric G. Bruggink
ERIC G. BRUGGINK
Senior Judge